**KENNY A., by his next friend Linda WINN, et al., Plaintiffs,**

v.

**Sonny PERDUE, et al., Defendants.**

**Civil Action 1:02–CV–1686–MHS.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 3, 2006.

See also, 356 F.Supp.2d 1353.

1262

Corey Fleming Hirokawa, Jeffrey O. Bramlett, Bondurant Mixson & Elmore, Atlanta, GA, Douglas C. Gray, Ira P. Lustbader, Jeffrey K. Powell, Marcia Robinson Lowry, Stacy F. Antonucci, Michael K. Bartosz, Children's Rights Inc., Erik S. Pitchal, New York City, for Plaintiffs.

Sarah Hechtman, Children's Rights, Inc., New York City, for Plaintiffs and Defendant.

Carmen R. Alexander, Eddie Snelling, Jr., John C. Jones, Kathleen Mary Pacious, Thurbert E. Baker, Office of State Attorney General, Mark Howard Cohen, J. Timothy Mast, Troutman Sanders, Rolesia Butler Dancy, Willie Jake Lovett, Jr., Andrew George MacKenzie, Overtis Hicks Brantley, Charissa Ann Ruel, Social Security Administration, Atlanta, GA, Elizabeth B. Taylor, Vivica Mitchell Brown, Jefferson James Davis, Davis & Davis, Stephen E. Whitted, William J. Linkous, III, Decatur, GA, Winston A. Denmark, Fincher Denmark & Williams LLC, Jonesboro, GA, for Defendants.

## ORDER

SHOOB, Senior District Judge.

Before the Court are plaintiffs' application for an award of attorneys' fees and expenses of litigation; State Defendants'

motion for review of taxation of costs by the Clerk of Court; and plaintiffs' motion for an interim award of attorneys' fees, costs, and expenses. The Court's rulings are set out below.[1]

*Introduction*

This class action brought on behalf of foster children in Fulton and DeKalb Counties has been one of the most complex and difficult cases that the undersigned has handled in more than 27 years on the bench. Now that the matter has been successfully concluded through entry of a Consent Decree, one difficult issue remains: what is a reasonable amount of attorneys' fees and expenses to be awarded to plaintiffs' counsel? The parties do not dispute that plaintiffs' counsel are entitled to an award, but they differ widely on the appropriate amount of the award.

Plaintiffs, applying both lodestar and percentage-of-the-benefit approaches, seek a fee award of $14,342,868. This amount represents an enhancement of plaintiffs' claimed lodestar figure by a multiplier of two, as well as approximately 8.5% of the $168,688,220 common benefit that plaintiffs claim they generated for the plaintiff class. Plaintiffs also seek an award of $1,658,341.38 in expenses, almost half of which was expended on experts. Included in this figure are costs already taxed by the Clerk pursuant to a bill of costs in the total amount of $549,808.43, most of which ($467,323.32) was spent for exemplification and copies of documents.

State Defendants contend that all of these amounts are unreasonable and grossly excessive. Arguing that a percentage-of-the-benefit approach is not appropriate, State Defendants contend that a reasonable lodestar figure would be $2,971,754.52 and that no enhancement of

the lodestar is warranted in this case. State Defendants also contend that none of plaintiffs' expert expenses are recoverable, and that an appropriate award for nontaxable expenses is $189,326.08. Finally, State Defendants object to a large portion of plaintiffs' claimed copying costs and argue that the costs taxed by the Clerk should be reduced to $95,485.08.

*Procedural History*

As essential background to evaluating plaintiffs' request for fees and expenses, it is important first of all to appreciate the enormous time and effort involved in litigating this complex matter. Therefore, before turning to the specifics of plaintiffs' request, the Court will briefly review the procedural history of the case. As this history demonstrates, State Defendants vigorously fought plaintiffs' claims for almost three years, filing both motions to dismiss and for summary judgment, as well as seeking repeatedly to limit plaintiffs' discovery efforts. This strategy of resistance undoubtedly prolonged this litigation and substantially increased the amount of fees and expenses that plaintiffs were required to incur.

The complaint in this action was filed on June 6, 2002, in the Superior Court of Fulton County. There were nine named plaintiffs, all foster children in the custody of the Georgia Department of Human Resources, who sought to represent a class of all foster children in Fulton and DeKalb Counties and a subclass of African–American foster children. Plaintiffs were represented by attorneys from Children's Rights, Inc. (CRI), a New York-based advocacy organization for children, and the Atlanta-based Keenan's Kids Law Center. Shortly thereafter, the Atlanta law firm of Bondurant, Mixon & Elmore (BME) joined the case as co-counsel for plaintiffs.[2]

---

1. The Court grants the parties' motions for leave to exceed page limitations.

2. Later, at the request of CRI and BME, the Court removed Keenan's Kids Law Center as

The 75–page complaint asserted fifteen causes of action under both federal and state law based on alleged systemic deficiencies in foster care in both Fulton and DeKalb Counties. The alleged deficiencies included (1) assigning excessive numbers of cases to inadequately trained and poorly supervised caseworkers; (2) not developing a sufficient number of foster homes properly screened to ensure the plaintiff children's safety; (3) not identifying adult relatives who could care for the plaintiff children as an alternative to strangers or impersonal institutions; (4) failing to provide relevant information and support services to foster parents in order to prevent foster placements from being disrupted; (5) failing to develop administrative controls such as an information management system that ensures plaintiff children are expeditiously placed in a foster home matched to meet the children's specific needs; (6) failing to provide timely and appropriate permanency planning, including failing to provide services that would enable plaintiffs to achieve their permanency planning goals; (7) placing plaintiffs in dangerous, unsanitary, inappropriate shelters and other placements; (8) failing to provide appropriate and necessary mental health, medical, and education services to children in their custody; and (9) separating teenage mothers in foster care from their own children and separating siblings in foster care from each other without providing visitation. (Compl.¶¶ 39–97.) Plaintiffs sought declaratory and injunctive relief to correct these alleged deficiencies.

The named defendants were the Governor of Georgia, the Georgia Department of Human Resources and its Commissioner, the Fulton County Department of Family and Children Services and its Director, and the DeKalb County Department of Family and Children Services and its Director (State Defendants). Plaintiffs also

sued Fulton and DeKalb Counties for their alleged failure to provide foster children with adequate and effective legal representation. Those claims were resolved in separate settlements reached between plaintiffs and each county. Since the pending motions involve only fees and expenses related to plaintiffs' claims against State Defendants, this procedural history omits any reference to matters involving only the claims against Fulton and DeKalb Counties.

On June 19, 2002, defendants removed the case to this Court. On July 1, 2002, the Court granted plaintiffs' motion for expedited discovery regarding one aspect of the case: the safety and well-being of foster children housed in Fulton and DeKalb Counties' two emergency children's shelters. On September 19, 2002, plaintiffs filed an 80–page motion and brief seeking a preliminary injunction prohibiting defendants from continuing to operate the shelters in a manner that allegedly violated plaintiffs' legal rights. State Defendants filed a 57–page response, and plaintiffs filed a 19–page reply. In November 2002, the Court held four days of hearings on the motion, during which the parties presented voluminous documentary evidence as well as both fact and expert witnesses. The parties then submitted more than 200 pages of proposed findings of fact and conclusions of law.

On December 12, 2002, the Court entered an Order finding that plaintiffs had established numerous major deficiencies in the foster care system in general and in the emergency shelters in particular. Nevertheless, in reliance on State Defendants' assurances that they planned to close the shelters and provide safe alternative emergency placements for children as well as address other deficiencies in the foster care system, and based largely on

co-counsel for plaintiffs. *See* Order of September 5, 2003.

the Court's confidence in the integrity and competence of then-Commissioner of Human Resources Jim Martin, the Court denied the motion for a preliminary injunction without prejudice to its being renewed by plaintiffs if State Defendants failed to fulfill their promise. State Defendants subsequently reported to the Court that the Fulton and DeKalb shelters had both been closed, thus mooting plaintiffs' claims relating to the shelters.

Meanwhile, on November 4, 2002, State Defendants filed a 44–page motion to dismiss, which argued that the Court was required to abstain from hearing plaintiffs' claims under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), because the proceedings would impermissibly interfere with ongoing juvenile court proceedings. State Defendants also argued that plaintiffs' claims were barred by the *Rooker–Feldman* doctrine. *See District of Columbia Ct. of Appeals v. Feldman,* 460 U.S. 462, 486, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415–16, 44 S.Ct. 149, 68 L.Ed. 362 (1923). Alternatively, State Defendants contended that most of plaintiffs' federal and state law claims failed to state a claim on which relief could be granted. State Defendants also filed a brief opposing class certification on the grounds that *Younger* abstention was required and that plaintiffs could not satisfy the commonality and typicality requirements.

While the Court took plaintiffs' motion for class certification and State Defendants' motion to dismiss under advisement, the parties proceeded with discovery, though not without resistance from State Defendants. At one point, the Court was forced to admonish State Defendants for "relying on technical legal objections to discovery requests in order to delay and hinder the discovery process." Order of January 7, 2003, at 4.

On July 7, 2003, the Court issued an Order extending fact discovery through October 31, 2003, and expert discovery through January 30, 2004. On August 18, 2003, the Court entered an Order denying State Defendants' motion to dismiss (except with regard to plaintiffs' shelter claims, which were dismissed as moot) and granting plaintiffs' motion for class certification. *Kenny A. v. Perdue,* 218 F.R.D. 277 (N.D.Ga.2003).

On February 20, 2004, following the close of discovery, State Defendants filed a motion for summary judgment. The motion was supported by a 74–page memorandum and a 126–page Statement of Undisputed Material Facts consisting of 612 separately number paragraphs, as well as a 48–page Statement of Legislative Facts consisting of 74 separately numbered paragraphs. In addition, State Defendants' motion was supported by six affidavits comprising more than 30 pages and by three volumes of appendices consisting of three expert reports and voluminous additional documents.

On April 5, 2004, plaintiffs filed a 96–page memorandum in opposition to State Defendants' motion for summary judgment together with a Statement of Disputed Material Facts that included a paragraph-by-paragraph response to State Defendants' Statement of Undisputed Material Facts. Plaintiffs' response was supported by four volumes of appendices comprising 178 exhibits. Plaintiffs also filed some 36 depositions together with voluminous deposition exhibits.

On May 7, 2004, State Defendants filed a 46–page reply brief. Then, on May 19, 2004, State Defendants filed a 38–page *Daubert* motion seeking to exclude the reports and testimony of all four of plaintiffs' experts. On June 7, 2004, plaintiffs filed a 25–page response together with copies of each of the experts' reports, totaling over

400 pages. Depositions of each of the experts were also filed with the Court. On June 21, 2004, State Defendants filed a 16-page reply brief.

Meanwhile, on May 27, 2004, the Court held a case management conference and set a trial date of early January 2005. In an effort to encourage settlement discussions, the Court directed plaintiffs to make a settlement offer within 30 days. On July 30, 2004, the Court entered an Order establishing a schedule for the parties to update discovery previously obtained, for plaintiffs to conduct updated case record and investigative file reviews, and for production of supplemental expert reports and related discovery. The Court also directed the parties to report on the progress of settlement discussions. Finally, the Court pushed the trial date back to February 14, 2005, and directed the parties to file their proposed consolidated pretrial order by January 31, 2005.

On August 13, 2004, reports from the parties indicated that settlement discussions were at an impasse. Therefore, the Court decided to refer the case to mediation and directed the parties to attempt to agree upon a qualified mediator or else submit separate lists of proposed mediators. The parties were unable to agree on a mediator and each side objected to all of the mediators proposed by the other side. Consequently, the Court decided to appoint a mediator of its own choosing and on October 25, 2004, entered an Order appointing retired Georgia Court of Appeals Judge Dorothy Toth Beasley to serve as mediator.

On December 13, 2004, the Court entered an Order denying State Defendants' motion for summary judgment and motion to exclude the reports and testimony of plaintiffs' experts. State Defendants promptly filed a motion to amend the Order to permit an immediate interlocutory appeal. While that motion was pending,

efforts at mediation began in earnest. According to Judge Beasley, over the next four months the parties attended eighteen separate mediation sessions where they spent more than 110 hours trying to hammer out a settlement agreement.

On January 13, 2005, in order to facilitate mediation efforts and at the joint request of the parties, the Court entered an Order postponing the due date of the pretrial order until February 18, 2005, and postponing the trial date indefinitely. As mediation proceeded, the parties requested and the Court granted another extension of the due date of the pretrial order until March 25, 2005. No further extensions were formally granted but as the parties continued to make progress in their settlement efforts, the Court suspended the deadline for filing the pretrial order indefinitely so that they could concentrate on mediation.

Finally, the parties reached agreement on all issues (except attorneys' fees). On July 5, 2005, they filed a joint motion for preliminary approval of the settlement agreement. The Court granted the motion and scheduled a fairness hearing for September 21, 2005. After considering the comments and objections of all interested parties, on October 27, 2005, the Court entered an Order approving the proposed Consent Decree.

As part of the Consent Decree, the parties agreed that plaintiffs were entitled to recover their expenses of litigation, including reasonable attorneys' fees and nontaxable expenses, pursuant to 42 U.S.C. § 1988 and Fed.R.Civ.P. 23(h). Consent Decree § 22. However, the parties were unable to reach agreement as to the appropriate amount of fees and expenses to be awarded.

On November 28, 2005, plaintiffs filed a bill of costs totaling $549,808.43, including $467,323.32 for "exemplification and copies

of papers necessarily obtained for use in the case." On January 18, 2006, the Clerk formally taxed these costs.

On December 9, 2005, plaintiffs moved for an award of attorneys' fees in the amount of $14,342,860 and nontaxable costs in the amount of $1,679,115.46.[3] In support of their motion plaintiffs submitted the declarations of CRI lead attorney Marcia Robinson Lowry, CRI staff attorney Sara M. Bartosz, BME lead attorney Jeffrey O. Bramlett, and Atlanta attorneys Ralph Knowles, Ralph Goldberg, John A. Chandler, Henry A. Fellows, Jr., and James C. Rawls. Attached to Ms. Lowry's and Mr. Bramlett's declarations were nearly 2,500 pages of time and expense records. According to their summary of those records, plaintiffs' counsel expended 29,908.73 hours on this case. Based on claimed hourly rates for attorneys ranging from $215 to $495 and for paralegals and interns ranging from $75 to $150, this time results in a lodestar fee of $7,171,434.30. Plaintiffs seek an award of twice this amount, both as an enhancement of the lodestar and as a percentage of the common benefit plaintiffs claim they generated for the plaintiff class.

In their response, filed January 4, 2006, and a separate motion for review of taxation of costs filed on January 19, 2006, State Defendants contend that all of these amounts are excessive. They argue that a reasonable award in this case would be $2,971,754.52 in attorneys' fees plus $189,326.08 in nontaxable expenses and $95,485.08 in taxable costs.

On January 27, 2006, plaintiffs filed a motion for an interim award of attorneys' fees, costs, and expenses in the amounts acknowledged by State Defendants to be reasonable. Initially, plaintiffs sought an immediate interim award before the Court determined the appropriate amount of a final award. In their reply brief, however, plaintiffs clarified that they sought an interim award only in the event that State Defendants chose to appeal the Court's final award. State Defendants oppose any interim award.

*Discussion*

The Court will first address plaintiffs' argument that they are entitled to an award of fees under the common fund/common benefit approach. Next the Court considers the lodestar analysis. The Court then considers an appropriate award of expenses. Finally, the Court addresses plaintiffs' request for an interim award of fees and expenses.

## I. *The Common Fund/Common Benefit Approach*

There are two principal exceptions to the general rule that each party to litigation must bear its own legal costs. First, there are fee-shifting statutes. Congress has enacted a number of statutes providing for the shifting of fees from one party to the other in certain circumstances. For example, 42 U.S.C. § 1988 is a fee-shifting statute which provides that a plaintiff who prevails in an action brought pursuant to certain civil rights laws, including 42 U.S.C. § 1983, is entitled to recover his or her reasonable attorneys' fees from the defendant. 42 U.S.C. § 1988(b). The parties in this case agree that plaintiffs are entitled to an award of attorneys' fees under this statute.

Second, there are the closely related common fund and common benefit doctrines. Under the common fund doctrine, attorneys in a class action in which a common fund is created are entitled to receive a reasonable percentage of the common fund as compensation for their services. *Camden I Condo. Ass'n, Inc. v.*

---

**3.** Plaintiffs subsequently corrected this figure to $1,658,341.38. (Pls.' Reply Br. at 49.)

*Dunkle,* 946 F.2d 768, 771 (11th Cir.1991). The common benefit doctrine extends the common fund doctrine to lawsuits that produce nonmonetary benefits. *Id.*

In this case, plaintiffs contend that under the common fund and common benefit doctrines they are entitled to a percentage of the value of the benefit conferred upon the plaintiff class by their efforts. By their calculation, the value of this benefit totals more than $168 million. (Bartosz Decl. ¶ 9.) This figure represents the sum of (1) enhancements to the budget of the Georgia Department of Family and Children Services occurring during the pendency of this action, and (2) fiscal obligations undertaken by the State Defendants to implement the Consent Decree. (*Id.* ¶¶ 6–8 & Ex. A.) For the following reasons, the Court concludes that neither the common fund doctrine nor the common benefit doctrine is applicable to this case.

■ First, the common fund doctrine is inapplicable because no fund was created by the parties' settlement. Instead, the settlement is one in which State Defendants have agreed to undertake certain actions to benefit foster children. Although it may be possible to place a dollar value on the benefit these actions will confer on the plaintiff class, this does not result in the creation of a common fund. The Sixth Circuit's analysis in a recent desegregation case is equally applicable to this case:

> [T]he [common fund] doctrine is inappropriate here because there is simply no fund. The benefit provided to the plaintiff class—the desegregation of Tennessee's system of higher education—is not pecuniary in any conventional way and did not result in the creation of a fund to be divided up among the plaintiffs, as is the case in common fund cases. Although ... the benefits attained could perhaps be *meas-*

*ured* as pecuniary—in the sense that a dollar value could be assigned to the cost of the remedial measures-transposing the action's social value into monetary value is imprecise, and more importantly, still leaves us without a fund. The money designated by Tennessee for the remedial programs goes to fund the programs, not to pay plaintiffs.

*Geier v. Sundquist,* 372 F.3d 784, 790 (6th Cir.2004)(emphasis in original).

Second, an award of fees under the common fund doctrine would be contrary to the doctrine's rationale. The common fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). Consistent with this perception, "a key element of the common fund case is that fees are not assessed against the unsuccessful litigant (fee shifting), but rather, are taken from the fund or damage recovery (fee spreading)." *Camden I,* 946 F.2d at 774. Here, however, plaintiffs acknowledge that "the fees requested must be paid by the state without cost or compromise to the benefit achieved for the Plaintiff Class." (Pls.' Br. at 28.) Thus, counsel do not seek to spread their fees among the members of the plaintiff class by obtaining a percentage of a common fund generated for their benefit. Instead, they seek to shift their fees to State Defendants by way of a calculation based on a purely hypothetical common fund.

■ Third, this case does not fall within the special subset of cases to which the common benefit doctrine applies. Common benefit recovery is appropriate only where the defendant and the beneficiaries share an identity of interests. *See generally* Alan Hirsch & Diane Sheehey, *Awarding Attorneys' Fees and Managing*

*Fee Litigation* 88–91 (Fed. Judicial Ctr.2d ed.2005). Such a recovery has generally been permitted in only two types of cases: suits by shareholders against their corporations and suits by union members against their union. *See Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Mills v. Elec. Auto–Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). In such cases, "[f]ees are paid by the defendant, because it is the alter ego of the beneficiaries who would otherwise be unjustly enriched by the suit." Hirsch & Sheehey, *supra,* at 88. However, "[i]f the defendant and the beneficiaries have no such identity of interests, an award against the defendant is improper because it would shift the costs unfairly." *Id.* at 88–89. Here, there is no identity of interests between State Defendants and members of the plaintiff class; therefore, a common benefit recovery would not serve to spread the costs among all the beneficiaries but would merely shift the costs to State Defendants, contrary to the purpose of the common benefit doctrine.

■ The fact that plaintiffs have asserted claims under Georgia law as well as 42 U.S.C. § 1983 does not change the foregoing analysis. As applied by the Georgia courts in the cases cited by plaintiffs, the common fund/common benefit doctrine is the same as that followed by the federal courts in the cases discussed above and is thus subject to the same restrictions. *See State of Georgia v. Private Truck Council of Am.,* 258 Ga. 531, 534–35, 371 S.E.2d 378 (1988); *Friedrich v. Fidelity Nat'l Bank,* 247 Ga.App. 704, 705–07, 545 S.E.2d 107 (2001).

Likewise, the Court's conclusion is not altered by the parties' acknowledgment that plaintiffs are entitled to recover their fees and expenses pursuant to Fed. R.Civ.P. 23(h), as well as 42 U.S.C. § 1988. Consent Decree § 22.A. Rule 23(h) provides in pertinent part that "[i]n an action certified as a class action, the court may award reasonable attorney fees and nontaxable costs authorized by law or by agreement of the parties." Fed.R.Civ.P. 23(h). "This subdivision," however, "does not undertake to create new grounds for an award of attorney fees or nontaxable costs," but "applies only when such awards are authorized by law or by agreement of the parties." Fed.R.Civ.P. 23(h), Advisory Committee Notes to 2003 Amendments. For the reasons discussed above, a recovery under the common fund/common benefit doctrine is not authorized by law in this case. Nor did the parties agree to such a recovery. Therefore, Rule 23(h) does not provide a basis for the Court to apply the common fund/common benefit approach.

## II. *The Lodestar Analysis*

Since the common fund/common benefit approach is not applicable to this case, the determination of an appropriate award of attorneys' fees is governed by 42 U.S.C. § 1988. The starting point for calculating reasonable attorneys' fees under 42 U.S.C. § 1988 is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" for the attorneys' services. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The product of these two numbers is commonly referred to as the "lodestar." *Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 563, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). After calculating the lodestar, the court may adjust the amount upwards or downwards based on a number of factors, such as the quality of the results obtained and the legal representation provided. *Blum,* 465 U.S. at 897, 104 S.Ct. 1541; *Duckworth v. Whisenant,* 97 F.3d 1393, 1396 (11th Cir.1996). In accordance with this methodology, the Court will calculate the lodestar by first determining the number of hours reason-

ably expended by plaintiffs' counsel on this litigation and then the hourly rates at which such work should reasonably be compensated. The Court will then consider whether any adjustment to the lodestar is appropriate in this case.

### A. Reasonable Hours

The Eleventh Circuit's decisions regarding attorneys' fees generally "contemplate a task-by-task examination of the hours billed." *ACLU of Georgia v. Barnes*, 168 F.3d 423, 429 (11th Cir.1999). However, the Eleventh Circuit has also stated that "[w]here fee documentation is voluminous, . . . an hour-by-hour review is both impractical and a waste of judicial resources," and therefore is not required. *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir.1994). In such cases, it is sufficient for the court to make "across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure," so long as it provides "a concise but clear explanation of its reasons for the reduction." *Id.*

This case clearly meets the requirements for a voluminous fee request. In *Loranger* itself, the motion, time sheets, and time summaries exceeded some 400 pages and sought recovery for approximately 3,000 hours billed by a single attorney. · *Id.* at 779. In this case, the time records alone exceed two *thousand* pages and represent nearly 30,000 hours billed by 38 timekeepers. Clearly, the Court cannot "feasibly and expeditiously" engage in an hour-by-hour review of such a fee application. *Id.* at 783. Therefore, in accordance with *Loranger*, the Court will determine the total number of hours devoted to the litigation and then reduce that figure in gross with an across-the-board percentage reduction if such a reduction is warranted.

In determining a reasonable number of hours, the Court must exclude hours that were not "reasonably expended" due to, for example, overstaffing. *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. "Work performed by multiple attorneys, however, is not subject to reduction where the attorneys were not unreasonably doing the same work." *Webster Greenthumb Co. v. Fulton County,* 112 F.Supp.2d 1339, 1350 (N.D.Ga.2000) (citations omitted). "Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. If counsel fails to do so, the Court must do it for them. *Barnes,* 168 F.3d at 428.

The Court also must give due weight to the sworn declarations of co-lead counsel for plaintiffs, Marcia Robinson Lowry and Jeffrey O. Bramlett, who state that they have reviewed the entries in each compilation of time records submitted and have written off charges which, in the exercise of their billing judgment, they deemed excessive; and that the compilations and the summaries attached to their declarations are an accurate and reliable account of the work performed in this case. (Lowry Decl. ¶ 8; Bramlett Decl. ¶ 6.) Ms. Lowry and Mr. Bramlett each attest that all of the hours submitted were reasonable and necessary in order to furnish adequate representation to the plaintiff class. (Lowry Decl. ¶ 9; Bramlett Decl. ¶ 9.) Plaintiffs have also submitted the declarations of five experienced Atlanta attorneys, each of whom attests that, in light of the nature and complexity of this case, the amount of time devoted to the case by class counsel was fair and reasonable and deserving of full compensation. (Knowles Decl. ¶ 7; Goldberg Decl. ¶ 8; Chandler Decl. ¶ 6; Fellows Decl. ¶ 6; Rawls Decl. ¶ 6.)[4]

---

4. Mr. Rawls notes a single exception for time charged by New York counsel for travel to

and from and within Atlanta if, during that

Tasks for which fees are recoverable "include pre-litigation services in preparation of filing the lawsuit, background research and reading in complex cases, productive attorney discussions and strategy sessions, negotiations, routine activities such as making telephone calls and reading mail related to the case, monitoring and enforcing the favorable judgment, and even preparing and litigating the request for attorneys' fees." *Webster Green-thumb*, 112 F.Supp.2d at 1350 (citations omitted). "Reasonable travel time of the prevailing party's attorneys ordinarily is compensated on an hourly basis, although the rate may be reduced if no legal work was performed during travel. As with attorneys' work, the hours expended by paralegals, law clerks, and other paraprofessionals are also compensable to the extent these individuals are engaged in work traditionally performed by an attorney." *Id.* (citations omitted).

The time records submitted in support of plaintiffs' fee application show that plaintiffs' attorneys, paralegals, and legal interns devoted a total of 29,908.73 hours to this litigation. (Lowry Decl. Ex. 2; Bramlett Decl. Ex. 1.) State Defendants have presented a number of specific objections to the hours billed. They contend, first of all, that the billing records reflect a lack of billing judgment generally insofar as the time entries are "riddled with many vague and noncompensable narratives." (State Defs.' Br. at 27.) State Defendants also contend that the number of hours spent by plaintiffs' counsel on certain tasks was excessive. Specifically, State Defendants object to the number of hours spent on the following tasks: complaint and mandatory disclosures (1,648.41 hours),

motion for preliminary injunction (1,770.33 hours), document production and analysis (7,195.86 hours), depositions and witness preparation (3,800.37 hours), discovery motions (777.13 hours), other investigation and background research (18.5 hours), intra- and inter-office conferences and correspondence(2,428 hours), expert witnesses and reports (1,819.76 hours), motion for summary judgment (1,720.99 hours), mediation and settlement (2,155.70 hours), pretrial motions (1,151.06), trial preparation (2,124.55 hours), attorneys' fees application (86.70 hours), and miscellaneous matters (1,050.08).[5]

After carefully considering each of State Defendants' objections and conducting its own review of plaintiffs' counsel's time records, the Court agrees that some reduction in hours is appropriate because of vague and noncompensable time entries and because an excessive number of hours was spent on certain tasks. The Court will address each of State Defendants' objections in turn below and then determine what overall percentage reduction in hours is appropriate.

### 1. *Billing Judgment*

State Defendants seek at least a 5% reduction in the total lodestar to account for vague and noncompensable time entries in plaintiffs' counsel's billing records. Plaintiffs have not responded to this objection. The Court has reviewed the entries cited by State Defendants and agrees that many of the entries are too vague to permit the Court to determine whether the time was reasonably expended. Many of the entries also reflect purely administrative tasks that are noncompensable.

time, actual legal work was not taking place. (Rawls Decl. ¶ 6.)

**5.** Plaintiffs' counsel failed to provide any task-by-task breakdown of their billing records, so

State Defendants undertook to categorize the entries by task and state their objections by task. Plaintiffs have not stated any objection to State Defendants' categorizations, so the Court accepts them as accurate.

Therefore, the Court will take these matters into account in determining an appropriate reduction in hours.

### 2. *Complaint and Mandatory Disclosures*

 State Defendants contend that the 1,648.41 hours billed for pre-suit investigation and researching and drafting the complaint and mandatory disclosures is excessive. Relying on a decision in an earlier case brought by CRI in Washington, D.C., State Defendants contend that no more than 450 hours is reasonable for this work. *See LaShawn A. v. Barry*, No. 89–1754, 1998 U.S. Dist. LEXIS 2137 at *18 (D.D.C. Feb. 17, 1998). State Defendants also argue that time spent researching a nuisance claim that was ultimately dismissed should not be allowed.

Plaintiffs respond that the hours spent were reasonable given the broad scope of the tasks included in this category, including factual investigation and legal research, evaluation of proper defendants, evaluation of the optimum scope for the case, evaluation of alternatives for achieving relief in state as well as federal courts, efforts to resolve the case prior to filing suit, as well as preparation of the initial complaint and mandatory disclosures. Plaintiffs point out that the pre-suit investigation in this case was an immense undertaking involving four state governmental hierarchies (DHR, State DFCS, Fulton DFCS, and DeKalb DFCS) and requiring extensive on-site witness interviews and follow-up factual investigations with foster children, foster parents, child advocates, members of the care provider community, adoption agency personnel, caseworkers, emergency shelter workers, law enforcement personnel, and various other stakeholders in Georgia's child welfare system, in addition to researching the parameters of plaintiffs' legal claims under seventeen causes of action covering state and federal law.

The Court recognizes that the preparation of this case for filing required a substantial amount of work, much more than even the average class action. The Court rejects State Defendants suggestion that the Court should apply an arbitrary 450–hour cap based on another case from another jurisdiction which State Defendants have not shown is comparable to this case. The Court also rejects State Defendants' claim that work on the dismissed nuisance claim should not be compensated. The nuisance claim was dismissed as moot following the closure of Fulton and DeKalb Counties' emergency shelters. *See Kenny A. v. Perdue*, 218 F.R.D. 277, 297 (N.D.Ga. 2003). As discussed below in connection with plaintiffs' motion for preliminary injunction, such closure came in part due to plaintiffs' efforts to close the shelters, which included the assertion of the nuisance claim. Therefore, time spent researching this claim is compensable.

Nevertheless, while the Court cannot say precisely how much time this work should have taken, based on its experience in other complex class actions, 1,648.41 hours is excessive for pre-suit investigation and drafting the complaint and mandatory disclosures. The Court will take this into account in determining an appropriate percentage reduction in hours.

### 3. *Motion for Preliminary Injunction*

 State Defendants contend that 1,770 hours to file pleadings, prepare for, and attend the preliminary injunction hearing is excessive. They note substantial billing entries by numerous timekeepers in the two months prior to the hearing and object to the fact that seven attorneys and two paralegals billed for their attendance at the hearing. State Defendants also contend that all time in this category should be excluded because the Court denied the motion for preliminary injunction.

In response, plaintiffs point out that at the time this work was performed, the Fulton and DeKalb shelters were operating and overpopulated with children, and there was no reliable assurance that these dangerous conditions would abate without injunctive relief. Plaintiffs note that the work included numerous depositions, document productions, expert site inspections, and child interviews. They argue that even though the Court ultimately denied the injunction, State Defendants' commitment to close the shelters was due in large part to their efforts. Finally, plaintiffs contend they did not overstaff the preliminary injunction hearing and invite the Court to compare State Defendants' level of staffing.

The Court concludes that plaintiffs are entitled to compensation for the work on the motion for preliminary injunction, except for an appropriate reduction for the unnecessary number of attorneys who attended the hearing. The fact that the Court ultimately denied the motion does not require exclusion of this time. The Court found that plaintiffs had "made a compelling case" but opted to deny plaintiffs' motion (without prejudice, it should be noted) based on State Defendants' assurances that the shelters would be closed. Order of December 12, 2002, at 3. The fact that the Court chose to rely on the State Defendants' assurances rather than issuing an injunction does not change the fact that, prior to plaintiffs' lawsuit, "few concrete steps were taken to close the shelters." *Id.* Plaintiffs' actions in filing this lawsuit and in seeking an injunction against the continued operation of the shelters were clearly major factors in the closure of these two dangerous shelters. Plaintiffs' efforts also resulted in the inclusion in the Consent Decree of significant protection against the risk of future peril from improper use of emergency shelters. *See* Consent Decree § 5.C.4.c. Accordingly, all

the time reasonably spent on the preliminary injunction motion is compensable.

As far as overstaffing is concerned, the Court agrees with State Defendants that having seven attorneys and two paralegals at the preliminary injunction hearing and billing time for each of those individuals was unreasonable. (According to the Court's records, State Defendants had four attorneys and an unknown number of paralegals present at the hearing.) The Court will take this overstaffing at the hearing into account in reducing the total number of hours to be compensated.

4. *Document Production and Analysis*

■ State Defendants purport to be "dumbfounded" by the 7,195.86 hours that plaintiffs' counsel spent on document production and analysis, notwithstanding their acknowledgment that "this was a document intensive case." (State Defs.' Br. at 38, 39.) They point to another recent case in this district, which was also a document intensive case and included evidence that the defendants had made the plaintiffs' task even more difficult, but where only 2,440 hours were required for document production and analysis. *See Webster Greenthumb,* 112 F.Supp.2d at 1358. State Defendants also express astonishment that the time billed does not include an additional 13,500 hours expended by outside case readers for whose time and expense plaintiffs seek recovery in the nontaxable expense category. State Defendants argue that a 50% reduction in the number of hours would be appropriate.

In response, plaintiffs note that over the course of this litigation, nearly *half a million* pages of documents were produced, which counsel had to organize, review, copy, and scan into a document management system. Plaintiffs then had to retrieve from this document database and review those documents pertinent or po-

tentially pertinent to each of more than 60 deposition witnesses and to the work of each of plaintiffs' experts. In addition, plaintiffs argue, even more comprehensive document retrieval and review were necessary to prepare various pre-trial filings, including the response to State Defendants' massive summary judgment motion and the pretrial order. As for the separate billings for case record review, plaintiffs argue that this was a completely separate task, which could have been done for half the price had State Defendants cooperated with plaintiffs' cost-saving proposal to conduct a joint record review. As it was, plaintiffs were forced to undertake an exhaustive and time consuming process that had to be updated twice due to delays in discovery caused by State Defendants in which the original files of hundreds of children in DFCS custody were produced for review by a team of case readers under the direction of one of plaintiffs' experts, and a similar review of abuse investigation files was conducted by readers under the supervision of another of plaintiffs' experts. Finally, plaintiffs argue that State Defendants have failed to explain how or why the tasks in *Webster Greenthumb* were in any way comparable to those in this facially dissimilar case.

The Court concludes that the hours spent on document production and analysis are somewhat excessive, but that State Defendants greatly underestimate the number of hours reasonably expended on this task. The sheer volume of documents produced in this case was overwhelming. The Court can personally attest to this fact based on the massive number of documents submitted by the parties just in connection with State Defendants' motion for summary judgment, a number that was undoubtedly only a very small percentage of the total number of documents produced in this case. It would be hard to overestimate the amount of time reasonably devoted to organizing, reviewing, and managing

such a huge number of documents. State Defendants' attempted comparison to the *Webster Greenthumb* case is clearly inapposite. The two cases are simply not comparable. In *Webster Greenthumb*, no class was ever certified. Thus, in responding to summary judgment issues and preparing for trial, the plaintiff's counsel in *Webster Greenthumb* faced a far less burdensome task than plaintiffs' counsel here had to undertake in connection with documents produced regarding two distinct child welfare offices and child populations in Fulton and DeKalb Counties.

At the same time, based on its experience in other complex, document intensive cases, the Court finds that more than 7,100 hours expended on document review and analysis over the two-and-one-half years between the filing of the complaint and the commencement of mediation is unreasonable. That is the equivalent of more than one full-time employee reviewing and analyzing documents continuously for that entire time period. Accordingly, some reduction in the number of hours expended in this category is appropriate, and the Court will take this into account in arriving at an overall reduction percentage.

5. *Depositions and Witness Preparation*

 State Defendants object on two grounds to the 3,800.37 hours that plaintiffs' counsel spent taking depositions and preparing witnesses. First, they contend that many of the depositions were overstaffed, citing seven instances where three plaintiffs' attorneys attended a deposition. Second, they argue that gross overbilling occurred in preparing for the depositions. In support of this argument, State Defendants cite a single example where three plaintiffs' attorneys spent a combined 205.12 hours preparing for two purportedly similar depositions, those of Aisha Caul

and Jane Cooper, the senior operational managers in the area of foster care for Fulton DFCS and DeKalb DFCS, respectively. State Defendants seek a 33% reduction of the hours in this category based on this alleged overstaffing and overbilling.

In response, plaintiffs point to the fact that State Defendants themselves chose to staff depositions with three and sometimes even four attorneys. They cite five examples, four where State Defendants had four attorneys in attendance at a deposition, and one where they had three. At all of these depositions, plaintiffs had only two counsel present. As for the single example of alleged overbilling, plaintiffs contend that the time spent preparing for the Caul and Cooper depositions was not unreasonable in light of the fact that these were among the most significant depositions taken in the case and that the Fulton and DeKalb DFCS offices had different organizational structures, different manifestations of systemic problems, different data and reporting systems, and sometimes different local policies in the field. Plaintiffs also note that each of the depositions spanned two days and produced transcripts running to 530 pages and over 400 pages, respectively.

The Court concludes that the number of hours expended in this category was reasonable. Plaintiffs prepared for and took or defended more than 60 depositions in this case, which works out to an average of approximately 63 hours per deposition. In light of the document review and other preparation needed for each deposition and the time spent in the depositions themselves, some of which spanned two days, this is not an unreasonable amount of time. State Defendants do not question the need for any of the depositions taken by plaintiffs. Their objection to plaintiffs' alleged overstaffing of depositions is not well-taken, since the record shows that State Defendants often had more attorneys in attendance at depositions than did plaintiffs. Finally, State Defendants' objection to alleged overbilling is also without merit, since the single example cited does not support their claim. Caul and Cooper were both critical witnesses whose depositions were difficult to prepare for because of their respective positions near the top of two related but dissimilar bureaucracies. Therefore, the Court cannot say that the time spent preparing for these depositions was unreasonable.

### 6. *Discovery Motions*

State Defendants contend that the 777.13 hours plaintiffs' counsel spent on discovery motions should be reduced by half for two reasons. First, they argue that an excessive number of attorneys attended the status conferences and other discovery-related conferences conducted by the Court. They cite two examples, one a discovery conference attended by three plaintiffs' attorneys and the other a status conference attended by five plaintiffs' attorneys. Second, State Defendants contend that counsel spent an excessive amount of time drafting discovery motions and responses and preparing for conferences. Specifically, they cite 99.61 hours spent preparing for a discovery conference before Judge Goger in Fulton Superior Court before this case was removed, 60.03 hours spent responding to a motion to compel filed by State Defendants, and 217.87 hours spent in connection with a request for authorization to inspect the WestCare facilities and interview foster children there, including 121.08 hours spent filing the initial motion.

Plaintiffs respond that the hours spent on all these tasks were reasonable. According to plaintiffs, the conference before Judge Goger involved an emergency motion for expedited discovery related to dangerous conditions at the Fulton and

DeKalb County shelters and required a substantial amount of time to conduct an independent investigation and compile a sufficient factual record to support the request. Similarly, plaintiffs contend that the time spent securing adequate discovery regarding the WestCare facilities was reasonable and necessary in light of State Defendants' resistance to allowing such discovery and the dangerous conditions at the facilities, which threatened the safety and well-being of children in the plaintiff class. Plaintiffs also argue that State Defendants should not be heard to complain about the time spent responding to their motion to compel, because the motion was baseless, was improperly filed without consulting with plaintiffs' counsel, and was filed in an effort to harass rather than to further a legitimate discovery need. As for alleged overstaffing, plaintiffs contend that State Defendants have offered no evidence to rebut counsel's declarations that the time billed was reasonable and necessary.

The Court concludes that the time spent preparing for the Goger discovery conference and in connection with the WestCare motion was reasonable. As plaintiffs correctly point out, the discovery conference before Judge Goger related to a motion for expedited discovery regarding dangerous conditions at the Fulton and DeKalb shelters. After removal, plaintiffs renewed the motion and this Court granted it following a hearing. *See* Order of July 3, 2002. The original 100-page motion, memorandum, and attached exhibits filed by plaintiffs in the superior court amply attest to the fact that this request for expedited discovery required substantial factual investigation and research by plaintiffs' counsel. Given the terrible conditions at the shelters that were ultimately revealed as a result of plaintiffs' efforts, it can hardly be argued that this time was not fully justified. Likewise, given the evidence of dangerous

conditions existing at the WestCare facilities, which replaced the DeKalb shelter, the time spent by plaintiffs' counsel to obtain access to those facilities was also fully justified, especially given that State Defendants unreasonably resisted such access notwithstanding the Court's prior admonition that "the rules of discovery were to be liberally construed to allow plaintiffs 'free and broad access to the shelters, their staff, and residents.'" Order of December 3, 2004, at 4 (quoting Order of July 23, 2002, at 6).

 The Court agrees with State Defendants, however, that time spent responding to their motion to compel was excessive. Plaintiffs' essential response to the motion was that it was moot because the documents sought had already been produced. It was clearly unnecessary to have spent in excess of 60 hours preparing this response. The Court also agrees with State Defendants that an unreasonable number of plaintiffs' attorneys attended many of the discovery and status conferences conducted by the Court. The Court believes it would have been reasonable for one attorney from CRI and one from BME to have attended such conferences, but often there were two or more attorneys from both CRI and BME present. Having this many attorneys present at Court conferences and billing time for each of them is unreasonable. Therefore, in arriving at an overall percentage reduction in hours, the Court will take into consideration both the overstaffing at these conferences and the excessive hours spent responding to State Defendants' motion to compel.

### 7. *Other Investigation and Background Research*

 State Defendants challenge only the following two items in this category on the grounds that the time was spent on matters not necessarily related to this

case: (1) 1.3 hours spent by a BME attorney researching CRI, and (2) 17.2 hours spent by BME attorneys researching this Court's Fulton County Jail case, including talking with plaintiffs' counsel in that case. Plaintiffs contend that all of this time was reasonably necessary and useful to the prosecution of this case and therefore compensable. The Court agrees. First, it was clearly of benefit to the plaintiff class for BME to inform itself about its potential co-counsel in this case, and less than an hour-and-a-half of research in this regard was certainly reasonable. Second, 17.2 hours of research regarding the course and outcome of similar civil rights litigation in this Court was reasonable and appropriate to inform counsel's strategic planning in this case. *See New York State Assoc. For Retarded Children v. Carey,* 711 F.2d 1136, 1146 & n. 5 (2d Cir.1983)(allowing compensation for background research and reading in complex cases).

### 8. *Intra- and Inter–Office Conferences and Correspondence*

 State Defendants seek a 50% reduction in the 2,428.04 hours spent by plaintiffs' counsel in conferences, meetings, and correspondence with other timekeepers. They note that this constitutes 8% of all time expended in the case and contend that this reflects a duplication of effort arising from the large number of plaintiffs' attorneys and paralegals who worked on the case, as well as the high rate of turnover among plaintiffs' counsel.

In response, plaintiffs argue that the hours spent on these tasks reflect the practical realities of large-scale litigation conducted by two different law offices, one in New York and one in Atlanta. They point out that the hours presented to the Court have already been reduced by plaintiffs' counsel by excluding time billed by more than three CRI attorneys for any particular meeting or conference. Finally, plaintiffs deny that attorney turnover had

any significant impact on the hours billed in this category, noting that the vast majority of time was spent by attorneys who worked on the case throughout all or most of the course of the litigation.

The Court rejects State Defendants' suggestion that a 50% reduction of the time in this category would be appropriate. Plaintiffs correctly point out that in order to conduct class action litigation efficiently and effectively, there must be careful planning, coordinated team execution, and open communication and sharing of information among team members, all of which are best achieved through period conferences to set strategy and assign resources. Plaintiffs are also correct in their contention that the amount of turnover experienced within counsel's respective offices would not have significantly impacted the number of hours billed in this category. Nevertheless, the Court believes that the very large number of attorneys and paralegals who worked on this case inevitably resulted in some duplication of effort. This is reflected by the fact that more than 8% of all the time expended on the case was devoted to communications among counsel. While some of this time was undoubtedly reasonable and necessary, the Court finds this percentage somewhat high even for a complex class action such as this. Accordingly, the Court believes that some reduction in these hours is appropriate and will consider this in arriving at an overall percentage reduction in hours.

### 9. *Expert Witnesses and Reports*

 State Defendants argue that the 1,819.76 hours spent by plaintiffs' counsel preparing and consulting with experts and drafting and revising expert reports is excessive and unnecessary. They contend that the attorneys' time should be reduced by 60% because plaintiffs' counsel should not be compensated for helping to prepare

or revise expert reports that were supposedly written by the experts themselves. In addition, State Defendants ask that the paralegals' time be reduced by 90% because the vast majority of the work they performed was administrative and secretarial in nature.

In response, plaintiffs contend that the substantial time devoted to the presentation of their four expert witnesses-three of whom prepared multiple reports to reflect developments within DHR and DFCS as the case proceeded through discovery-was entirely appropriate and reasonable given the sheer volume of systemic evidence to be considered. They argue that the experts took complete responsibility for forming their opinions and identifying the issues to be reviewed, but that a significant amount of attorney and paralegal time was required to pull together and supply pertinent information from depositions, documents, or other evidentiary sources as the experts directed during the course of their reviews.

The Court concludes that the hours expended in this category are excessive, although not to the extent suggested by State Defendants. Undoubtedly, a large amount of attorney and paralegal time was reasonably and necessarily devoted to aiding plaintiffs' experts in their review of the voluminous depositions, documents, and other evidentiary materials produced in this case. Nevertheless, some time entries by attorneys reflect time spent drafting and revising expert reports, work which should have been done by the experts themselves. Likewise, many of the paralegals' time entries reflect that the work performed was administrative and secretarial in nature. Such nonlegal work by paralegals is not compensable. Accordingly, the Court will take this into account when it considers a reasonable percentage reduction in the total hours expended on this case.

### 10. *Motion for Summary Judgment*

█ State Defendants seek a 75% reduction in the 1,720.99 hours expended by plaintiffs' counsel in responding to their motion for summary judgment. They argue that this large amount of time expended in just a little over a month preparing a single brief and response to a statement of undisputed material facts is grossly excessive.

Plaintiffs contend that the hours were justified because of the sheer size of State Defendants' motion, which included a 74–page memorandum and a 126–page statement of undisputed material facts consisting of 612 separately number paragraphs, as well as a 48–page statement of legislative facts consisting of 74 separately numbered paragraphs, six affidavits comprising more than 30 pages, and three volumes of appendices consisting of three expert reports and voluminous additional documents. Plaintiffs also contend that the motion never should have been filed at all because the vast evidentiary record compiled in this litigation raised myriad factual disputes in relation to a broad range of material issues.

Regardless of whether State Defendants acted in bad faith by filing a motion for summary judgment, the Court concludes that the time expended by plaintiffs' counsel in responding to the motion was clearly excessive. Even taking into consideration the voluminous nature of the motion and the time-consuming task of responding to each paragraph of State Defendants' statement of undisputed material facts, the number of hours expended was unreasonable. One need only consider the fact that 1,720 hours is the equivalent of one attorney working full time for nearly an entire year to conclude that no response to a motion for summary judgment justifies such an expenditure of time. The Court will take this into consideration in arriving

at an appropriate overall percentage reduction in plaintiffs' counsel's hours.

### 11. *Mediation and Settlement*

State Defendants object to the 2,155.70 hours plaintiffs' counsel spent working on mediation and settlement. Specifically, they contend that Mr. Lustbader's and Mr. Bramlett's time should be reduced because they billed substantially more hours than Ms. Lowry, who was plaintiffs' principal negotiator. State Defendants also contend that Ms. Hirokawa's hours should be reduced because her primary role was to type notes on a laptop during the meetings, a task that could have been performed by a paralegal billing at a much lower rate.

Plaintiffs contend that State Defendants' argument fails to take into account the substantial legal analysis, professional judgment, research, document review, preparation, drafting, and consultations among counsel, clients, and with Georgia child welfare stakeholders that were necessary both between mediation sessions and during break-out sessions outside the presence of State Defendants' counsel. Specifically, plaintiffs note that Mr. Lustbader spent substantial time and effort preparing, formulating, and drafting plaintiffs' mediation proposals, and that Ms. Hirokawa participated substantially in formulating, drafting, and revising plaintiffs' proposals and in consulting with co-counsel concerning these proposals during the course of the mediation.

The Court concludes that the time expended in this category is reasonable. The mediation effort in this case went far beyond anything that this Court has seen in any previous case. Not only were there nearly twenty mediation sessions conducted over a period of months, but this intensive negotiation effort clearly required, in addition to the mediation sessions themselves, substantially more time outside the sessions to research, discuss, formulate, and draft different settlement proposals. The final result of all this effort was a detailed, 47–page Consent Decree that provided extraordinary benefits to the plaintiff class and avoided the costs and risks of a lengthy trial. State Defendants offer nothing but their unsupported "belief" to challenge the number of hours spent by some of plaintiffs' attorneys in this effort. This is clearly insufficient to overcome the sworn testimony presented by plaintiffs that the time spent was reasonable and necessary.

### 12. *Pretrial motions*

Of the 2,124.55 hours expended in this category, State Defendants seek to exclude entirely 705.62 hours expended after December 1, 2004, on preparation of the pre-trial order. State Defendants argue that this time should be excluded because it came after the Court had ordered the parties to mediation, and it was clear that adequate time would be allowed for preparing the pre-trial order if no settlement were reached.

In response, plaintiffs point to their frequently voiced insistence on the earliest trial date possible in order to assure that plaintiff class members did not continue to be denied basic child welfare services for any longer than necessary. Plaintiffs also note their legitimate concern that the delay occasioned by an unsuccessful mediation would require a further case record review to update systemic performance data, resulting in even greater cost and even further delay. Accordingly, plaintiffs' counsel believed that timely preparation of the final pretrial order represented the prudent and, most likely, the least expensive litigation approach under the uncertain circumstances.

The Court concludes that counsel's time spent preparing the pretrial order is fully

compensable. Even though the pretrial order was never filed because the parties ultimately reached a settlement, the issue "is not whether hindsight vindicates an attorney's time expenditures, but whether at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir.1992). Here, faced with the uncertain prospect of successful mediation and the need to be ready for trial promptly if mediation should fail, plaintiffs' counsel reasonably exercised their professional judgment to suspend trial preparation only when it became evident that mediation might actually bear fruit. Therefore, the hours they reasonably spent preparing the pretrial order, even after mediation was under way, are fully compensable.

### 13. *Trial Preparation*

■ State Defendants seek a 90% reduction in the 2,124.55 hours expended by plaintiffs' counsel for trial preparation, almost all of which was spent drafting findings of fact and conclusions of law, arguing that this amount of time was grossly excessive and largely unnecessary. Plaintiffs respond that, without the benefit of hindsight, they were required to prepare this case as if it was going to trial until it became reasonably clear that the case would settle. Plaintiffs argue that the large amount of time spent preparing detailed and comprehensive findings of fact and conclusions of law was reasonable and necessary because the child welfare systems that were the target of this action evolved and changed while the suit was pending, thus requiring plaintiffs to continuously revise and update their draft findings and conclusions.

As noted above with respect to time spent on the pretrial order, the Court appreciates that plaintiffs could not suspend all trial preparation efforts once mediation was under way in the mere hope that a

settlement would be reached. Consequently, some amount of time spent drafting proposed findings and conclusions is clearly reasonable. Nevertheless, the Court cannot agree that it was reasonable to spend more than 2,000 hours on this task. While the Court does not believe that the 90% reduction sought by State Defendants is reasonable, the Court finds that some reduction in this category is appropriate. Accordingly, the Court will take this into consideration in determining the overall percentage reduction figure.

### 14. *Attorneys' Fees Application*

■ State Defendants seek to exclude all 86.70 hours expended by plaintiffs' counsel on their fee application. They argue that none of the time claimed in this category is compensable because the billing records and the fee submission itself show that counsel spent all time in this category on their baseless common fund argument and no time seeking to assist the Court in addressing the lodestar analysis. Plaintiffs respond that the law is well settled that time spent on a fee application is compensable, and they dispute State Defendants' characterization of their common fund argument.

The Court concludes that the time spent preparing the fee application is fully compensable. The courts are unanimous that time spent working on a fee petition and litigating a fee dispute is compensable. Hirsch & Sheehey, *supra*, at 28 & n. 149. Although the Court found the common fund/common benefit doctrine to be inapplicable, plaintiffs' argument in this regard was not frivolous. Also, although plaintiffs' counsel did not organize their time records by task, they did prepare extensive declarations describing the work done in this case and they responded in detail to each of State Defendants' objections to the

fee petition. They are entitled to be compensated for this time.

### 15. *Miscellaneous*

 Defendants challenge two items in this category. First, they object to 58.75 hours expended in connection with the removal of Keenan's Kids Law Center as co-counsel for plaintiffs, arguing that State Defendants should not be required to compensate plaintiffs' counsel for their "internecine squabbles." (State Defs.' Br. at 65–66.) Plaintiffs argue that these hours were reasonably expended for the benefit of the plaintiff class and in furtherance of the efficient conduct of this litigation and are therefore compensable. Plaintiffs also note that they have not sought compensation for any time spent on the case by Keenan's Kids Law Center before its removal, resulting in a net decrease in State Defendants' liability for fees and expenses. The Court concludes that this time is compensable because it was reasonably and necessarily expended for the benefit of the plaintiff class.

Second, State Defendants seek a 10% reduction of the 767.27 hours spent by plaintiffs' counsel on travel on the grounds that it is excessive. State Defendants also contend that all travel time should be compensated at only one-half the normal hourly rate. The Court concludes that no reduction in travel time is justified. State Defendants contend that travel by multiple persons for the same deposition or mediation session was excessive. However, the Court has rejected the contention that plaintiffs overstaffed depositions, and State Defendants made no claim that mediation sessions were overstaffed. The Court finds that such travel was therefore reasonable. The Court, however, agrees with State Defendants that all travel time should be compensated at one-half the normal hourly rate. *See, e.g., Wilder v. Bernstein,* 975 F.Supp. 276, 284

(S.D.N.Y.1997)(compensating CRI attorneys at 50% of determined hourly rate).

### B. *Hourly Rates*

 next step in the lodestar calculation is the determination of "a reasonable hourly rate" for the attorneys' services. *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. A reasonable hourly rate is "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Barnes,* 168 F.3d at 436 (quoting *Norman v. Housing Auth. of City of Montgomery,* 836 F.2d 1292, 1299 (11th Cir.1988)). The applicant attorney's customary billing rate for fee-paying clients ordinarily is the best evidence of his market rate, although that information is not necessarily conclusive. *Dillard v. City of Greensboro,* 213 F.3d 1347, 1354–55 (11th Cir.2000). A fee applicant may also provide opinion evidence of reasonable rates, which is usually done by submitting affidavits of other attorneys in the relevant legal community. *Duckworth,* 97 F.3d at 1396–97. Finally, the Court may use its own personal experience and expertise to assess the lawyering skills exhibited in the case. *Id.* at 1397.

 counsel have requested reimbursement at the following hourly rates for the attorneys who worked on this case:

| CRI | | BME | |
|---|---|---|---|
| Marcia Lowry | $495 | Jeff Bramlett | $450 |
| Ira Lustbader | $320 | Corey Hirokawa | $240 |
| Sara Bartosz | $360 | Gordon Hamrick | $225 |
| Rose Firestein | $380 | Lynn Adam | $290 |
| Sarah Hechtman | $305 | Jennifer Jordan | $225 |
| Douglas Gray | $280 | Nicole Iannarone | $225 |
| Jeff Powell | $255 | Alison Prout | $215 |
| Erik Pitchal | $245 | | |
| Stacy Antonucci | $220 | | |
| Margaret Ross | $215 | | |

In addition, plaintiffs' counsel seek reimbursement for time spent by paralegals, legal interns, and legal assistants at rates

ranging from $75 to $150 per hour. (Lowry Decl. Ex. 2; Bramlett Decl. Ex. 1.)

In support of these rates, plaintiffs have submitted the sworn declarations of co-lead counsel Marcia Robinson Lowry and Jeffrey O. Bramlett, who state that the rates are fair, reasonable, and consistent with hourly rates in the Atlanta market for the price of legal services of comparable quality rendered in cases demanding similar skill, judgment, and performance. (Lowry Decl. ¶ 25; Bramlett Decl. ¶ 10.) Mr. Bramlett further states that the rates requested for BME attorneys and legal assistants reflect the rates his law firm currently charges and collects from clients who hire the firm to perform services on a Standard Hourly Rate basis. (Bramlett Decl. ¶ 6.) In addition, plaintiffs have submitted the sworn declarations of several highly experienced and well-respected members of the Atlanta bar, each of whom states that the rates requested are "reasonable and solidly within the range of hourly rates currently prevailing in the Atlanta market and customarily charged to and collected from clients for legal services requiring comparable skill, judgment, professional reputation and experience." (Chandler Decl. ¶ 5; Fellows Decl. ¶ 5; Rawls Decl. ¶ 5.)

State Defendants offer no evidence to rebut the prima facie proof of prevailing market rates submitted in connection with plaintiffs' fee application. Nevertheless, State Defendants argue that the Court should reduce Ms. Lowry's rate from $495 to $450 per hour, and the respective hourly rates for Ms. Firestein ($380) and Ms. Bartosz ($360) to $320 per hour. With regard to Ms. Lowry, State Defendants question whether the requested rate is truly an Atlanta rate, as claimed, rather than a New York rate, citing a 2004 New Jersey case in which Ms. Lowry sought only $400 per hour. State Defendants argue that there is no reason to value her

time at a higher rate than Mr. Bramlett's, especially in the absence of any evidence explaining why her Atlanta rate should be higher than almost all other attorneys in the market, and given the fact that Mr. Bramlett himself is compensated near the very high end of the market. As for Ms. Firestein and Ms. Bartosz, State Defendants argue that there is no reason their rates should be any higher than Mr. Lustbader's, who is CRI's associate director and acted as plaintiffs' "field marshal" in this litigation. (State Defs.' Br. at 72.)

In response, plaintiffs point out that the $400 per hour New Jersey rate for Ms. Lowry was part of a negotiated settlement of a disputed fee claim. With regard to Ms. Firestein and Ms. Bartosz, plaintiffs note that they both have significantly more experience than Mr. Lustbader (32 years and 19 years, respectively, as opposed to 13 years). Plaintiffs argue that in the absence of any evidence rebutting the reasonableness of their requested rates and in light of the advanced responsibilities shouldered by Mr. Lustbader, State Defendants' argument would appear to support an upward adjustment in Mr. Lustbader's rate rather than a downward adjustment in Ms. Firestein's and Ms. Bartosz's rates.

The Court concludes that the requested hourly rates are fair and reasonable. First, plaintiffs have carried their burden of presenting prima facie proof that the requested rates are consistent with the prevailing market rates in Atlanta for comparable work. State Defendants have presented no contrary evidence. Under these circumstances, it would arguably be an abuse of discretion for the Court to reduce the hourly rates requested. *See Washington v. Philadelphia County Ct. of Common Pleas*, 89 F.3d 1031, 1036 (3rd Cir. 1996)(where plaintiff met his prima facie burden under the "community market rate" lodestar test, and opposing party

produced no contradictory evidence, the district court could not exercise its discretion to adjust the requested rate downward). In any event, based upon the Court's own substantial experience and familiarity with the prevailing rates in Atlanta, and the Court's observation of the stellar performance of plaintiffs' counsel throughout this long and difficult case, it finds the requested hourly rates eminently fair and reasonable. If anything, they are too low.

Second, the rate that Ms. Lowry agreed to as part of a negotiated settlement of a fee dispute in another case has no relevance to the reasonable rate in this case. Given Ms. Lowry's more than 35 years' experience and her reputation as one of the preeminent child welfare rights attorneys in the country, it is certainly fair and reasonable that her time in this case should be compensated near the high end of the Atlanta market.

Finally, as plaintiffs correctly observe, the differential between Ms. Firestein's and Ms. Bartosz's rates and Mr. Lustbader's rate, when viewed in light of Mr. Lustbader's substantial responsibilities in the case, suggests that Mr. Lustbader's rate may be too low, not that Ms. Firestein's and Ms. Bartosz's rates are too high.

## C. Calculation of the Lodestar

 Pursuant to the foregoing discussion of the reasonable number of hours expended on this case and reasonable hourly rates, the Court calculates plaintiffs' lodestar fee to be $6,012,802.90. In arriving at this amount, the Court made an across-the-board 15% reduction in the number of non-travel related hours claimed by plaintiffs' counsel. This percentage was determined by considering (1) the vague and noncompensable entries in counsel's billing records, *supra* section II. A.1; (2) the excessive number of hours spent on pre-suit investigation and drafting the complaint and mandatory disclosures, *supra* section II.A.2; (3) overstaffing at the preliminary injunction hearing, *supra* section II.A.3; (4) the excessive number of hours spent on document production and analysis, *supra* section II.A.4; (5) the excessive number of hours spent responding to a motion to compel and overstaffing of discovery and status conferences, *supra* section II.A.6; (6) the excessive number of hours spent in intra- and inter-officer conferences and correspondence, *supra* section II.A.8; (7) noncompensable time spent on expert witnesses and reports, *supra* section II.A.9; (8) the excessive number of hours spent responding to the motion for summary judgment, *supra* section II.A.10; and (9) the excessive number of hours spent on trial preparation, *supra* section II.A.13.

In determining the appropriate percentage reduction in hours to apply, the Court also considered other cases where similar reductions have been made. *See, e.g., Hensley*, 461 U.S. at 438 n. 13, 103 S.Ct. 1933 (approving 30% reduction to account for attorney's inexperience and failure to keep contemporaneous time records); *Marisol A. v. Giuliani*, 111 F.Supp.2d 381, 401 (S.D.N.Y.2000)(reducing hours by 15% to account for time spent on certain noncompensable matters, excessive time spent on certain other matters, and overstaffing); *T.M. Park Ave. Assocs. v. Pataki*, 44 F.Supp.2d 158, 169 (N.D.N.Y.1999), *vacated on other grounds*, 214 F.3d 344 (2d Cir.2000)(reducing hours by 10% to account for insufficiently detailed records and 10% to account for excessive hours); *Wilder*, 975 F.Supp. at 286 (reducing lodestar by 10% to account for vague time entries); *Walker v. Coughlin*, 909 F.Supp. 872, 881 (W.D.N.Y.1995)(reducing hours by 15% to account for inadequate documentation and lower rate of compensation); *Ragin v. Harry Macklowe Real Estate Co.*,

870 F.Supp. 510, 520–21 (S.D.N.Y.1994)(reducing fee request by 30% to account for vagueness, duplicative claims, and failure to provide contemporaneous time records); *Meriwether v. Coughlin*, 727 F.Supp. 823, 827 (S.D.N.Y.1989)(reducing fee request by 15% to account for vague entries).

The Court first calculated non-travel related fees by deducting any travel related time from the timekeeper's total, multiplying the resulting number by 0.85, and then multiplying that number by the appropriate hourly rate. The Court then calculated travel related fees by multiplying travel related hours by one-half of the appropriate hourly rate for each timekeeper who claimed travel time. The sum of the resulting calculations equals the lodestar, as set out below:

CRI non-travel related fees

| | Hourly Rate | Hours Claimed × 0.85 | Total |
| --- | --- | --- | --- |
| M. Lowry | $495 | 766.01 | $ 379,174.95 |
| I. Lustbader | $320 | 3227.16 | $1,032,691.20 |
| S. Bartosz | $360 | 1393.63 | $ 501,706.80 |
| R. Firestein | $380 | 394.75 | $ 150,005.00 |
| S. Hechtman | $305 | 823.44 | $ 251,149.20 |
| D. Gray | $280 | 1462.54 | $ 409,511.20 |
| J. Powell | $255 | 2248.10 | $ 573,265.50 |
| E. Pitchal | $245 | 1295.05 | $ 317,287.25 |
| S. Antonucci | $220 | 1206.19 | $ 265,361.80 |
| M. Ross | $215 | 241.61 | $ 51,946.15 |
| Legal Interns | $150 | 616.39 | $ 92,458.50 |
| Paralegals | $ 90 | 5260.96 | $ 473,486.40 |
| Total | | | $4,498,043.95 |

BME non-travel related fees

| | Hourly Rate | Hours Claimed × 0.85 | Total |
| --- | --- | --- | --- |
| J. Bramlett | $450 | 1472.20 | $ 662,490.00 |
| C. Hirokawa | $240 | 930.16 | $ 223,238.40 |
| G. Hamrick | $225 | 621.01 | $ 139,727.25 |
| L. Adam | $290 | 175.70 | $ 50,953.00 |
| J. Jordan | $225 | 33.49 | $ 7,535.25 |
| N. Iannarone | $225 | 15.56 | $ 3,501.00 |
| A. Prout | $215 | 15.56 | $ 3,345.40 |
| T. Reed | $150 | 1057.23 | $ 158,584.50 |
| J. Hogan | $115 | 469.80 | $ 54,027.00 |
| J. Taylor | $ 80 | 548.0 | $ 43,840.00 |
| T. Longshore | $ 95 | 258.15 | $ 24,524.25 |
| L. Amato | $ 80 | 128.27 | $ 10,261.60 |
| S. Fuselier | $135 | 73.78 | $ 9,960.30 |
| J. Clark | $150 | 22.36 | $ 3,354.00 |
| E. Young | $ 75 | 12.75 | $ 956.25 |
| Total | | | $1,396,298.20 |

Travel related fees

| | Hourly Rate | Hours Expended | Total |
| --- | --- | --- | --- |
| M. Lowry | $247.50 | 148.58 | $ 36,773.55 |
| I. Lustbader | $160 | 176.0 | $ 28,160.00 |
| R. Firestein | $190 | 28.0 | $ 5,320.00 |
| S. Hechtman | $152.50 | 23.50 | $ 3,583.75 |
| D. Gray | $140 | 29.82 | $ 4,174.80 |
| J. Powell | $127.50 | 150.14 | $ 19,142.85 |
| E. Pitchal | $122.50 | 79.64 | $ 9,755.90 |
| S. Antonucci | $110 | 86.59 | $ 9,524.90 |
| J. Einbond | $ 45 | 45.0 | $ 2,025.00 |
| Total | | | $ 118,460.75 |
| Grand Total | | | $6,012,802.90 |

The Court notes that this lodestar figure is commensurate with the attorneys' fees expended by State Defendants in this case. Evidence submitted by plaintiffs shows that through June 30, 2005, the State paid its two outside counsel in this case, Mark Cohen of Troutman Sanders and Jeff Davis of Davis & Davis, a total of approximately $2.4 million. (Pls.' Reply Br. Ex. 4.) This figure does not take into account the fact that outside counsel working for the State are paid at significantly lower hourly rates than they would charge private clients.[6] Nor does it include 5,237.12 hours that attorneys within the State Law Department spent on this case. (*Id.*) Adjusting outside counsel's fees upward to account for their reduced hourly rates, and

**6.** The evidence submitted by plaintiffs shows that in 2002 the State paid Mr. Cohen $175 per hour for work on a suit challenging the State's redistricting plans, and that he was hired earlier this year, at a rate of $225 per hour, to defend the State's new law requiring voters to present a photo ID at polls. (Pls.' Reply Br. Ex. 5.) Based on the Court's own knowledge of prevailing market rates for legal services in Atlanta, these rates are approximately one-half of what an attorney of Mr. Cohen's experience and ability would generally charge a private client. Thus, the Court notes that State Defendants did not object to a $450 standard hourly rate for Mr. Bramlett, an attorney of comparable experience to Mr. Cohen.

applying a modest $250 blended hourly rate to the hours spent on this case by Law Department professionals, indicates that State Defendants would have incurred legal fees in excess of $6 million if they had been required to pay for their legal services in this case at standard hourly rates in the private marketplace.[7]

### D. *Adjustment to the Lodestar*

The calculation of the lodestar does not end the Court's inquiry. "There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933 (footnote omitted); *see also Blum*, 465 U.S. at 897, 104 S.Ct. 1541 ("there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high"). "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee ..., and indeed in some cases of exceptional success an enhanced award may be justified." *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933.

The Court recognizes that most of the factors relevant to calculating a reasonable fee award are already reflected in the lodestar amount and "thus cannot serve as independent bases for increasing the basic fee award." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). Nevertheless, upward adjustments of the lodestar figure are still permissible "in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'" *Blum*, 465 U.S. at 899, 104 S.Ct. 1541 (quoting *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933); *see also Norman*, 836 F.2d at 1302. The Court finds that plaintiffs have submitted such specific evidence in this case.

First, the evidence establishes that the quality of service rendered by class counsel, including their extraordinary commitment of capital resources, was far superior to what consumers of legal services in the legal marketplace in Atlanta could reasonably expect to receive for the rates used in the lodestar calculation. Specifically, the evidence shows that the hourly rates used in the lodestar calculation do not take into account (1) the fact that class counsel were required to advance case expenses of $1.7 million over a three-year period with no ongoing reimbursement, (2) the fact that class counsel were not paid on an on-going basis as the work was being performed, and (3) the fact that class counsel's ability to recover a fee and expense reimbursement were completely contingent on the outcome of the case.[8] (Chandler Decl. ¶¶ 5–8; Fellows Decl. ¶¶ 5–8; Knowles Decl. ¶¶ 7–12; Rawls Decl. ¶¶ 5–8; Lowry Decl. ¶ 25; Bramlett Decl. ¶¶ 7(a) & (g), 10, 13–14.)

In addition, based on its personal observation of plaintiffs' counsel's performance throughout this litigation, the Court finds that the superb quality of their represen-

---

7. Doubling outside counsel's fees to approximately $4.8 million to account for their reduced hourly rates, *see* note 6 *supra*, and adding $1.3 million as the approximate value of professionals' time in the State Law Department (5,237.12 hours × $250 per hour) produces an overall adjusted fee of $6.1 million.

8. A lodestar enhancement cannot be based on contingency alone. *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). In this case, however, the risk of nonrecovery is only one of several factors which, taken together, establish a level of service well beyond what could reasonably be expected for the rates claimed.

tation far exceeded what could reasonably be expected for the standard hourly rates used to calculate the lodestar. Quite simply, plaintiffs' counsel brought a higher degree of skill, commitment, dedication, and professionalism to this litigation than the Court has seen displayed by the attorneys in any other case during its 27 years on the bench. The foster children of Fulton and DeKalb Counties were indeed fortunate to have such unparalleled legal representation, and the Court would be remiss if it failed to compensate counsel for this extraordinary level of service to their clients.

Finally, the evidence establishes that plaintiffs' success in this case was truly exceptional. (Knowles Decl. ¶ 8; Goldberg Decl. ¶ 5; Lowry Decl. ¶ 22–24.) The Consent Decree provides sweeping relief to the plaintiff class, the scope of which can only be fully appreciated by summarizing its provisions. Its centerpiece is a series of thirty-one outcome measures that State Defendants have agreed to meet and sustain for at least three consecutive six-month reporting periods.

The outcome measures, many of them requiring phased-in results over a two-year period, seek to improve performance in the following areas: timely commencement and thorough completion of investigations of reported abuse or neglect; regular visits of foster children by case workers; approval and licensure of foster homes and other placements; the percentage of children who are the victims of substantiated maltreatment while in foster care; the percentage of children in foster homes that exceed their licensed capacity; the percentage of children who have experienced multiple moves while in foster care; and periodic judicial reviews of the safety and status of foster children.

In addition, the Consent Decree requires comprehensive and periodic delivery of medical, dental, and mental health services to foster children; a detailed process for improved goal-setting, case planning and periodic reviews of children's status while in foster care; limits on the placement of children in emergency shelters and group homes and institutions, and protections against overcrowding in foster homes; and the establishment of reimbursement rates to adequately compensate providers for caring for foster children.

Moreover, State Defendants commit to reduced caseloads for all case managers and supervisors; a fully implemented single statewide automated child welfare information system; and maintaining or establishing placements and related services identified in a "needs assessment" to be conducted by a neutral expert. The settlement also includes processes for the supervision of private contract agencies that provide homes and services for foster children; improvements in foster parent screening, licensing and training, as well as foster parent support and communication; improvements in case manager training; improvements in processes for addressing suspected abuse or neglect and suspected corporal punishment of children in foster care; and improvements in efforts to maximize available federal funding.

Finally, the settlement provides that two child welfare specialists will serve as the Court's independent accountability agents charged with the responsibility of measuring and reporting publicly on the State Defendants' compliance with these and other undertakings as specified in the Consent Decree.

As the foregoing summary amply demonstrates, the settlement achieved by plaintiffs' counsel is comprehensive in its scope and detailed in its coverage. Indeed, the Court has previously recognized that even if plaintiffs had prevailed in a trial of this case, it is doubtful that they would have obtained relief as "intricately

detailed and comprehensive" as that contained in the Consent Decree. Order for Final Approval of Consent Decree at 14 (Oct. 27, 2005). In the same Order, the Court observed that, "[c]onsidering the scope and detail of the comprehensive settlement reached by the parties in this case, particularly in light of the contentiousness of the litigation, complexity of the issues and the uncertainties and delays of further litigation, the Court finds the result achieved by the parties to be extraordinary." *Id.* The Court's assessment of the result achieved by plaintiffs' counsel in this case has not changed. After 58 years as a practicing attorney and federal judge, the Court is unaware of any other case in which a plaintiff class has achieved such a favorable result on such a comprehensive scale.

Based on the foregoing considerations, the Court concludes that the lodestar should be adjusted upward by a multiplier of 1.75, resulting in a total fee award of $10,522,405.08. In determining the appropriate multiplier, the Court has relied on the foregoing evidence supporting an enhancement of the lodestar, the Court's own experience and expertise in this area, and on the declarations of four disinterested Atlanta attorneys submitted by plaintiffs. Each of these attorneys—Ralph Knowles, John Chandler, Hank Fellows, and Jim Rawls—is well known to the Court and well respected in the Atlanta legal community, and each has extensive experience in complex class action litigation. Based on their review of this case, three of these attorneys state that "a multiplier of no less than 1.5–2 times the lodestar" would be necessary to "yield a reasonable fee consistent with prevailing prices in the Atlanta legal market for legal services of comparable value." (Chandler Decl. ¶ 8; Fellows

Decl. ¶ 8; Rawls Decl. ¶ 8.) The fourth states that successful class counsel in similar cases have received multiples of 1.5–5 times the lodestar and recommends a multiplier of 5 in this case. (Knowles Decl. ¶ 12.) Considering all the evidence presented, the Court believes that it has selected the minimum enhancement of the lodestar necessary to reasonably compensate plaintiffs' counsel for their exceptional work and the exceptional result they achieved in this case.

### III. *Expenses*

Plaintiffs seek to recover $1,658,341.38 in total expenses, including $549,808.43 already taxed by the Clerk pursuant to a bill of costs. In addition, plaintiffs seek prejudgment interest on each item of expense, and they also ask the Court to require State Defendants to bear all the costs of mediation. State Defendants challenge portions of both the nontaxable expenses and the taxable costs. They also contend that plaintiffs are not entitled to prejudgment interest, and they object to being required to pay all mediation costs. The Court will address each of these matters in turn and then calculate an appropriate expense award.[9]

#### A. *Nontaxable Expenses*

"[W]ith the exception of routine office overhead normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs under § 1988. As is true in other applications of section 1988, the standard of reasonableness is to be given a liberal interpretation." *Barnes,* 168 F.3d at 438 (quoting *Dowdell v. City of Apopka,* 698

---

9. Plaintiffs acknowledge that in order to avoid a double recovery, the costs ultimately taxed pursuant to the bill of costs should be deduct-

ed from the total expense award. (Pls.' Reply Br. at 50 n. 39.)

F.2d 1181, 1192 (11th Cir.1983)). As discussed below, State Defendants object to plaintiffs' recovery of all or a portion of the claimed expenses in the following categories.

### 1. *Expert and Case Record Reviewer Fees and Expenses*

█ State Defendants contend that plaintiffs are precluded from recovering $801,864.40 [10] in claimed expert fees and expenses because 42 U.S.C. § 1988 does not explicitly allow recovery of expert fees in § 1983 cases. Plaintiffs argue that they are entitled to recover these fees and expenses for two reasons. First, they contend that such fees and expenses are recoverable in "hybrid" cases like this one, which involve claims under both § 1983 and other laws. Second, plaintiffs argue that the Court may award these costs because State Defendants' own conduct in litigiously refusing to participate in a joint case record review unreasonably and unnecessarily compounded these expenses. For the following reasons, the Court concludes that these expenses are not recoverable.

The Supreme Court has held that expert witness fees cannot be awarded to prevailing parties in cases brought under 42 U.S.C. § 1983 because 42 U.S.C. § 1988, which governs fee awards in such cases, does not explicitly allow recovery of expert fees in § 1983 actions. *West Virginia Univ. Hosp., Inc. v. Casey,* 499 U.S. 83, 102, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). Plaintiffs argue that *Casey* does not preclude recovery here because they asserted claims under other laws in addition to § 1983. However, the *Webster Greenthumb* decision on which plaintiffs rely does not support this argument. In *Webster Greenthumb,* Judge Thrash found that

expert expenses were recoverable only because that case involved a claim under 42 U.S.C. § 1981, and Congress had amended § 1988 following *Casey* to explicitly authorize expert fee recovery in § 1981 cases. *Webster Greenthumb,* 112 F.Supp.2d at 1380–81. Thus, *Webster Greenthumb* does not stand for the proposition that expert fees are recoverable in § 1983 cases that also assert claims under *any* other laws.

In this case, plaintiffs asserted fifteen causes of action under both federal and state law. The federal law claims were brought pursuant to 42 U.S.C. § 1983 for alleged violations of certain of plaintiffs' federal constitutional and statutory rights, while the state law claims were based on alleged violations of certain rights secured under the Georgia Constitution and several Georgia statutes. *See Kenny A.,* 218 F.R.D. at 283. Plaintiffs have cited no authority to support their contention that the mere existence of these state law claims somehow gives rise to a right to recover expert fees and expenses when no such right is provided in § 1988 with respect to the § 1983 claims.

Plaintiffs also contend that these fees and expenses are recoverable under 28 U.S.C. § 1927 due to State Defendants' refusal to participate in a joint case record review. Section 1927 authorizes the Court to require "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously ... to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Plaintiffs, however, have submitted no evidence to support their claim that counsel for State Defendants acted "unreasonably and vexatiously" in refus-

---

**10.** Plaintiffs' initial brief states that they expended $820,854.47 on experts (Pls.' Br. at 35), but State Defendants seek a reduction of only $801,864.40 based on their own calculation of the actual expense records. (State Defs.' Br. at 87 n. 28.)

ing to agree to a joint case record review. Even if this were shown, it would not entitle plaintiffs to recover *all* of their expert fees and expenses, but only the *excess* costs that were incurred due to State Defendants' unreasonable and vexatious conduct. Plaintiffs have submitted no evidence of what this amount might be. Thus, there is no evidence in the record on the basis of which the Court could make an award of expert fees under 28 U.S.C. § 1927.

### 2. *Meals and Meeting Expenses*

 Defendants object to BME's claim of a total of $1,324.08 for "business meals" and CRI's claims of $16,647.52 for "travel/meals" and $2,706.63 listed as "meeting expenses" (which, upon review, are charges for lunches and dinners for attorneys in the case) on the grounds that the cost of meals is a common overhead expense that is not recoverable under 42 U.S.C. § 1988. Plaintiffs contend that meals are a type of expense for which the Court may allow reimbursement because they would be charged to a paying client in the relevant market, relying on the unrebutted attorney declarations stating that plaintiffs' overall expenses were reasonable.

The Court agrees with State Defendants that the cost of meals is a common overhead expense and therefore not recoverable. *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1299 n. 13 (11th Cir.1999)(noting district court's elimination of costs of meals for class counsel); *Brother v. Miami Hotel Inv., Ltd.*, 341 F.Supp.2d 1230, 1240 (S.D.Fla.2004)(costs of meals disallowed since they should be absorbed as general overhead); *Rau v. Apple–Rio Mgmt. Co.*, 1:97–cv–2345–GGB, 2000 U.S. Dist. LEXIS 20375 at *22 (N.D.Ga. Mar. 29, 2000)(excluding costs of meals during trial "as meals are normal expenses of everyday life"); *Eastland v. Tenn. Valley Auth.*, No. 73–G–0487–NW,

1987 U.S. Dist. LEXIS 9085 at *20 (N.D.Ala. Sept. 30, 1987)("Meals are unrecoverable as common overhead expense.").

### 3. *Federal Express Charges*

 State Defendants seek a 90% reduction in the $56,859.45 sought by plaintiffs for Federal Express delivery charges. State Defendants argue that they should not be assessed this unusually large Federal Express expense because plaintiffs' counsel elected to forgo using regular mail delivery service and instead chose the luxury and convenience of an overnight delivery service.

In response, plaintiffs have submitted the declaration of Tanya C. Reed, a paralegal who was the primary case manager for this litigation at BME. Ms. Reed states that the bulk of the Federal Express expenses were necessitated by State Defendants' frequent eleventh-hour document productions shortly before critical depositions or series of depositions. (Reed Decl. ¶ 8.) Because of these last-minute productions, plaintiffs' counsel were required to make substantial use of Federal Express deliveries in order to send copies of documents between Atlanta and New York counsel, so that counsel could adequately prepare for the pending depositions. *Id.*

Based on Ms. Reed's declaration, as well as the attorney declarations submitted by plaintiffs, the Court concludes that the Federal Express expenses were reasonably and necessarily incurred and are therefore recoverable.

### 4. *CRI Phone Charges*

 State Defendants seek a 50% reduction in the claim by CRI for $15,053.77 in telephone charges. State Defendants contend that these charges are unreasonable in light of many of the descriptions of the charges and the fact that they are nearly five times higher than the long

distance charges submitted by BME. They specifically challenge two entries that appear to be personal and unrelated to this case and question over $800 in charges incurred before the complaint was filed.

Plaintiffs contend that the amount is entirely reasonable considering over four years of fact and witness development and the obvious need for regular communications among plaintiffs' counsel and between plaintiffs' counsel and State Defendants' counsel. Plaintiffs note that it is hardly surprising that CRI's phone charges are significantly higher than BME's since this action was filed and litigated in Atlanta. Plaintiffs also contend that $800 of phone charges over six months of pre-filing investigation is entirely reasonable. Finally, plaintiffs agree to withdraw the two apparently personal entries, totaling $354.60.

For the reasons given by plaintiffs, the Court concludes that the amount claimed for telephone charges is reasonable and therefore recoverable, with the exception of the $354.60 in charges that plaintiffs have withdrawn.

### 5. Travel and Hotel Expenses

■ State Defendants seek a 25% across-the-board reduction in the $162,181.17 requested by plaintiffs for airfare and hotels. They raise four objections. First, State Defendants argue that the amount is excessive insofar as much of the travel resulted from plaintiffs' overstaffing various hearings, depositions, and conferences. Second, State Defendants contend that travel of out-of-town counsel could have been reduced because local counsel could have ably handled many matters in the case. Third, State Defendants object to reimbursement of a "travel agent fee" for airline flights booked by CRI. Finally, State Defendants argue that expenses for seven trips to New York by Mr. Bramlett are excessive.

The Court concludes that these charges are entirely reasonable given that this case was litigated over a period of more than three years and included over 60 depositions and six months of face-to-face settlement negotiations. The Court has found that the claim of overstaffing is unfounded except for the preliminary injunction hearing, and it is the Court's recollection that New York counsel did the lion's share of the work at that hearing so their travel was not unnecessary. While local counsel in this case was certainly quite able, it was not unreasonable for CRI and especially Ms. Lowry to serve as co-lead counsel given the extent of their experience and expertise in the area of child welfare litigation. The objection to the travel agent charge is unfounded, since this is an ordinary expense of travel and presumably resulted in a net cost savings by obtaining the most direct flight and the least expensive fare available. Finally, the Court finds that Mr. Bramlett's expenditure of $7,151.76 in travel expenses to meet with New York co-counsel and expert witnesses over the course of this four-year litigation is reasonable, especially considering that the alternative was for New York legal team members to travel to Atlanta, likely resulting in the equivalent or even greater expense.

### 6. Public Transportation

■ State Defendants seek a 50% reduction in CRI's claim for $36,384.49 for "public transportation." State Defendants argue that a review of the entries in this category reveals that many are for the cost of CRI attorneys and paralegals to take taxis home from the office. State Defendants contend that plaintiffs are entitled to reimbursement for reasonable out-of-town travel but not for the convenience CRI offers its staff in taking taxis home from its office.

Based on the unrebutted attorney declarations submitted by plaintiffs, which establish that these charges are fair and reasonable in light of the declarants' experience with the types of expenses typically charged to paying clients in the Atlanta market, the Court concludes that these expenses are recoverable.

### B. *Taxable Costs*

In their motion for review of taxation of costs, State Defendants object to all of the $467,323.32 claimed by plaintiffs' counsel for photocopying costs, except for $12,999.97 listed as paid to third-party contractors as reimbursement for copies made of those contractors' files. Relying on a line of cases dealing with the extent to which copying costs can be recovered as taxable costs under 28 U.S.C. § 1920, State Defendants argue that these costs should not be allowed because plaintiffs failed to submit any documentation to establish that the copies made were necessary for use in this case rather than merely for counsel's own convenience.

In response, plaintiffs note that State Defendants themselves admit that this was an extremely document intensive case. Therefore, in order to streamline the process of document review and analysis and to limit the number of paper copies that needed to be made, plaintiffs' counsel determined that the most cost-effective method of document management was to develop an electronic document database accessible by plaintiffs' counsel in both Atlanta and New York. (Reed Decl. ¶ 4.) Once documents were produced and loaded into this database, additional paper copies for use at depositions or as court exhibits could be printed as "blowbacks" from this system. (*Id.*) The vast majority of BME's outside copying expenses—which, at $315,253.44, make up the lion's share of the total copying costs—were payments to a third-party vendor for imaging the more than 400,000 pages of documents produced by State Defendants and third parties so they could placed into this database. (*Id.* ¶ 5.) Although this was a significant expense, had plaintiffs not used this database system, overall copying costs would have been substantially greater. (*Id.*) Plaintiffs also note that they incurred substantial costs related to imaging and producing to State Defendants documents relating to plaintiffs' experts, and that substantial additional copying of documents was required in preparing for over 60 depositions and filing and serving over 40 briefs, including the necessarily voluminous opposition to State Defendants' massive summary judgment motion. (*Id.* ¶¶ 6–7.)

Finally, plaintiffs argue that whether their copying costs are fully taxable is ultimately academic, since they are entitled to compensation for both their taxable costs pursuant to 28 U.S.C. § 1920 and their reasonable nontaxable expenses pursuant to 42 U.S.C. § 1988. According to plaintiffs, the evidence establishes that all of these expenditures were reasonable and necessary, so even if they are not recoverable as taxable costs, they are recoverable as nontaxable expenses. In either event, the net amount owed is the same.

The Court agrees with State Defendants that the documentation submitted by plaintiffs' counsel is insufficient to permit recovery of the disputed amount as taxable costs under 28 U.S.C. § 1920. *See Breitenbach v. Neiman Marcus Group,* 181 F.R.D. 544, 546 (N.D.Ga.1998)("The party seeking to recover photocopy costs must come forward with evidence showing the nature of the documents copied including how they were used or intended to be used in the case."). However, the Court agrees with plaintiffs that the disputed amount is nevertheless recoverable as nontaxable expenses under 42 U.S.C. § 1988. Based on the evidence submitted by plaintiffs, the Court finds that plaintiffs' counsel exer-

cised reasonable professional judgment in electing to set up an electronic document database to handle the voluminous documents in this case and that the costs incurred in doing so, although significant, were less than would have otherwise been reasonably required to maintain these extensive documents in paper format. The Court further finds that the copying costs incurred were fully justified in light of the large number of depositions taken and briefs filed in this case, and especially in light of the voluminous response by plaintiffs necessitated by State Defendants' massive motion for summary judgment.

Accordingly, the Court grants State Defendants' motion for review of taxation of costs and reduces the costs taxed by the Clerk for exemplification and copies of documents from $467,323.32 to $12,999.97, which reduces the total costs taxed to $95,485.08. The balance of plaintiffs' copying costs will be allowed as nontaxable expenses recoverable under 42 U.S.C. § 1988.

### C. *Interest*

 Plaintiffs seek to recover interest on each item of expenses at the Georgia legal rate of 7% from the date the expense was incurred until the date of payment. State Defendants contend that, as a matter of law, interest on expenses runs only from the date of judgment, in this case the date the Court entered the Consent Decree, which was October 27, 2005. Plaintiffs, however, argue that pre-judgment interest is a necessary equitable component in calculating an expense award that fully and fairly compensates plaintiffs' counsel for the significant risk they incurred in undertaking this costly litigation.

Case law in this circuit is clear that interest on nontaxable expenses, as well as taxable costs, runs from the date of entry of judgment. *See BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d

1045, 1052–53 (11th Cir.1994); *Ga. Ass'n of Retarded Citizens v. McDaniel*, 855 F.2d 794, 799 (11th Cir.1988); *Lambert v. Fulton County, Ga.*, 151 F.Supp.2d 1364, 1380 (N.D.Ga.2000); *Webster Greenthumb*, 112 F.Supp.2d at 1384. Plaintiffs have cited no authority authorizing an award of prejudgment interest. Accordingly, the Court concludes that interest on expenses shall run from October 27, 2005.

### D. *Mediation Expenses*

 In its Order appointing Judge Beasley as mediator in this case, the Court directed that plaintiffs and defendants each bear one-half of the costs of mediation. Order of October 25, 2004. Plaintiffs contend that they are entitled to recover all mediation costs as part of nontaxable expenses recoverable under 42 U.S.C. § 1988 and ask the Court to order State Defendants to pay these costs once Judge Beasley presents her bill. State Defendants argue that plaintiffs should still bear one-half of the mediation costs in accordance with the Court's previous Order.

The costs of mediation are clearly recoverable expenses under 42 U.S.C. § 1988. *See Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir.1983)("all reasonable expenses incurred ... as an aspect of settlement of the case may be taxed as costs under section 1988"). The fact that the Court originally ordered the parties to share the costs of mediation is irrelevant. The costs were shared (or would have been shared had the mediator presented a bill) before this case was settled. Now that the case has been settled and the parties have agreed that plaintiffs are entitled to recover their nontaxable expenses, plaintiffs' portion of the mediation costs is one of the items recoverable. Therefore, when the mediator presents her statement of account, State Defendants shall be responsi-

ble for paying the total amount owed in connection with the mediation between plaintiffs and State Defendants.

### E. *Calculation of Expense Award*

In accordance with the foregoing discussion, the Court calculates the expense award as follows:

| | |
|---|---|
| Total Expenses Claimed | $1,658,341.38 |
| Reduction for Items included in Bill of Costs | –$ 95,485.08 |
| Reductions for Nonrecoverable Items | |
| Experts & Case Record Reviewers | –$ 801,864.80 |
| Meals & Meeting Expenses | –$ 20,678.23 |
| CRI Phone Charges | –$ 354.60 |
| Total | $ 739,958.67 |

### IV. *Interim Award*

 In the event that State Defendants choose to appeal the Court's fee award in this case, plaintiffs' seek an interim award in the amount that State Defendants have conceded is reasonable: $2,971,754.52 in attorneys' fees, $189,326.08 in nontaxable expenses, and $95,485.08 in taxable costs, for a total interim award of $3,356,565.68. Plaintiffs contend that since State Defendants have conceded that plaintiffs are entitled to these amounts, they will not be prejudiced by such an interim award. On the other hand, plaintiffs argue that since they have already invested very substantial time and money in this protracted litigation, failure to make an interim award during the pendency of any appeal will prejudice them and reward the State Defendants for alleged dilatory tactics.

The Court concludes that such an interim award would be inconsistent with the stay of monetary judgments available under Fed.R.Civ.P. 62(d). Rule 62(d) allows for a stay pending appeal as "a matter of right" if the appellant files a supersedeas bond. *United States v. Wylie*, 730 F.2d 1401, 1402 n. 2 (11th Cir.1984). Therefore, if State Defendants choose to exercise their right of appeal from this order, and if they post the required supersedeas bond, they are entitled to a stay as a matter of right. This Court has no discretion to require State Defendants to pay a portion of the amount awarded pending the completion of any such appeal. The Court notes, however, that plaintiffs will be compensated for any delay in payment occasioned by an appeal, because interest will run on the full amount of the fee and expense award from October 27, 2005, the date of entry of the Consent Decree. *See Ga. Ass'n of Retarded Citizens*, 855 F.2d at 799; *Webster Greenthumb*, 112 F.Supp.2d at 1384.

### *Conclusion*

As discussed above, this has been a long, complex, and difficult case. The award of plaintiffs' attorneys' fees and expenses is necessarily a large one. To a great extent, the size of the award reflects State Defendants' strategy of resistance against efforts to reform a foster care system that even they ultimately admitted was badly in need of reform. For the foregoing reasons, the Court GRANTS the parties' motions to exceed page limitations [# 509, # 513]; GRANTS plaintiffs' application for award of attorneys' fees and expenses of litigation [# 495], as modified by the Court; GRANTS State Defendants' motion for review of taxation of costs by Clerk of Court [# 512]; and DENIES plaintiffs' motion for an interim award of attorneys' fees, costs, and expenses [# 516]. The Court AWARDS plaintiffs attorneys' fees in the amount of $10,522,405.08 and nontaxable expenses in the amount of $739,958.67 for a total award of $11,262,363.75. The Court DIRECTS the Clerk to enter a judgment in favor of plaintiffs and against State Defendants in this amount and for post-judgment interest at the legal rate from October 27, 2005 (the date of entry of the Consent Decree). The Court DIRECTS the Clerk to modify the costs taxed on January 18, 2006 [# 518], and to tax costs in favor of plaintiffs and against State Defendants in the

amount $95,485.08. Finally, the Court ORDERS State Defendants to pay the entire cost of mediation.